Good morning again ladies and gentlemen. We now have Teva Pharmaceuticals v. Eli Lilly. 2020, 17, 47, 48, 49, 50, 51, and 52. Mr. Jay, please proceed. Thank you, Your Honor. May it please the Court. These patents claim the first humanized antibodies to target the ligand CGRP and the board thought that the asserted combination of references would teach a skilled artisan to study or use such a humanized NICGRP antibody. That study or use motivation was procedurally improper but it also is not borne out by the substance. The board focused so narrowly on whether the references used the words study or explore that it failed to consider the references as a whole and that changed how it weighed three things in particular. Differences between... Counsel, the claim is almost anticipated by CAN except for the humanized limitation and that is provided by Queen. So why wasn't the board correct? The board wasn't correct, Your Honor, because in order for there to be a motivation to make a humanized anti-CGRP ligand targeting antibody, you would need more motivation than CAN can possibly provide. And so what are antibodies to be used for? Not for rats. It's fairly obvious to humanize an antibody that is related to human disease. Perhaps eventually, Your Honor, but I think as the collection of art in this case indicates, there was substantial uncertainty both about the role of CGRP and about the appropriate mechanism to take advantage of the role that CGRP plays in disorders such as migraine. So for example, the superiority of targeting the receptor based on, among other things, safety concerns, that's something that's been raised by Wimola-Lanza. And if there's a broader point that I can make about this collection of art, just to respond directly to your question, you have several aspects of both CAN and Wimola-Lanza that are urging further animal studies before proceeding to human trials. So I think that while the Wimola-Lanza is a great way to develop a human therapy, the teachings of CAN alone, which remember is 10 years before the priority date, don't give the skilled artisan a basis to pursue a humanized antibody that would target the ligand. Why wasn't it obvious to try? I don't think it was obvious to try, Your Honor, most significantly because of the failed result in CAN itself. The full size antibody in CAN did not achieve immunoblockade, and on that point the board agreed with us and made a finding to that effect at Appendix 43. Lily is attempting to derive... Weren't there suggestions to improve the effectiveness of the pulse sequence? So this is the 16% point that our friends on the other side refer to and what the board referred to as optimism. What CAN says is that there may be a prospect if you change the dosage and the time of getting the full-size antibody into the interstitial space, but even that expression of optimism doesn't suggest that there be a positive result even in an animal study. That's just about getting the full-length antibody on site in a sufficient concentration. There's no finding that it would work, that it would actually achieve immunoblockade, and we would submit that given that this optimism is expressed 10 years before the priority date, it was not a routine matter to go forward and develop a full-length that would be efficacious. Isn't that exactly the problem, that last word that you're saying, efficacious? I mean, you talk about humanized antibody, but I think the board's concern was the breadth of the claims in these patents, which don't really require that they be efficacious for any real purpose. I take that point, Your Honor, but I do think that even if we're looking just at motivation to make a humanized antibody, antibodies can be studied in rat trials, CGRP can be studied in animal trials. I think it's ground here that the only reason to humanize this antibody is to use it in human patients, and if the art taught that there would not be a successful result from using the full-length antibody to antagonize the receptor, then that is certainly relevant to motivation. But if you look at what the board did, take for example the way it treated the studies of the small molecule receptor antagonist, BIBN, and this is at pages 54 and 55 of the decision in the appendix. The board just declined to reach the question whether someone would believe that, based on the success of BIBN, that an anti-CGRP ligand-targeting antibody would be effective. It says that a skill origin would just be motivated to study antagonism generally, and our submission is that that's not a sufficient basis to make a humanized antibody, especially not one that, as the dependent claim indicates, is to be in a pharmaceutical composition. It seems to me, this is Judge Bryson, that what your saying is that the ultimate goal, as I think you described it, of treating humans has to be satisfied even though the claims are not directed to that ultimate goal. I mean, the claims are explicitly directed to the generation of humanized anti-CGRP antagonist antibodies, and medicine often proceeds by stages where the ultimate goal is treatment, but that doesn't mean that you have to have an expectation that, in the prior art, that the treatment will be successful if your intermediate stage is more modest. I understand that point, Your Honor, and I certainly agree as a general matter, but on the facts of this case, you know, where you have, for example, the board putting together the TAN experiment from 10 years before the priority date with Wimowawansa, which is primarily a literature review, but that focuses heavily on antagonizing the receptor and not the ligand, and Wimowawansa's warning of potential deleterious side effects of targeting the ligand rather than the receptor. That's why it advocates for extremely specific receptor antagonists. So when you have right there in the references, in the obviousness combination, urging, taking a different path because of safety considerations, I think that's certainly relevant to the asserted motivation to combine what are, you know, fairly disparate references. Wimowawansa and TAN do refer to the possibility of creating humanized antibodies, full-length anti-CRGP, CGRP antagonist antibodies, right? I mean, Wimowawansa certainly does, not at great length, but they do make a reference to that possibility. So it's not as if they were saying this isn't workable. So I don't agree with that reading of Wimowawansa, Your Honor, although I don't think that you necessarily need to agree with what I'm about to say in order to agree with the thrust of our point about Wimowawansa, which is the focus on the safety concerns and the recommendation to pursue the receptor antagonist. But if you look at every, the sentence on which the board relies is literally the last sentence of Wimowawansa in the conclusion, and it is summarizing what has come before. And if you look at what has come before, you see specifically that for all of the conditions where the reference is discussing the use of anti-CGRP antibodies, they're all receptor-specific or they aren't antibodies at all. So diabetes, receptor-specific. Sepsis, blocking the receptor, and specifically calling for further studies in an animal model. Migraine, extremely... But counsel, you mentioned the conclusion of Wimowawansa. It states the role of CGRP antagonists in humanized monoclonal antibodies should be explored. These are antagonists of the ligands, not the receptors. No, that's my point, Your Honor, is that if you look, for example, at the discussion of septic shock, you will see that an anti-CGRP antibody, as Wimowawansa uses that term, can be a receptor antagonist. An antibody can antagonize the receptor and not the ligand. And that's our submission, that that is what Wimowawansa is talking about. Consistently... Can I ask you a hypothetical question? You know, assuming... What if there were, for instance, a transgenic mouse that expresses human CGRP protein? Couldn't use humanized monoclonal antibodies to study in that methodology without worrying about all the safety concerns that you point out? So in your hypothetical, the CGRP in the mouse's body is... So the mouse has both its own CGRP and there's also human CGRP in the mouse's body? Yeah, in a transgenic mouse. I guess... In other words, isn't there a way to use humanized monoclonal antibodies to study without having to put it into a person? Yeah, I understand the question. I'm not aware of anything in the record from the time of the priority date that suggests anything other than human trials for humanized antibodies. I don't want to say that it's impossible, but I'm not aware of any suggestion in the record supporting the motivation on a theory like that. I take it to be agreed upon in the record in this case that the purpose of making a humanized antibody is to avoid the immunogenicity that would be caused by using it in a human, that is subject to the immune system and that would react negatively to a non-human antibody. Okay. So I think... I'm sorry, Mr. Jay, just to go back to Wimowansa and accepting, as you say, that Wimowansa does not discuss at great length, much length at all, the possibility of a non-receptor-based CGRP antagonist. Nonetheless, both the last sentence, but also an earlier sentence, I think Appendix 6586, says much the same thing about saying that the CGRP antagonist or both seems to me to suggest at least that they're talking not just about receptor-based antagonists. Isn't that right? I don't think so. I'll put it this way, isn't that a fair reading of Wimowansa that would be within the board's discretion to read the reference in that way? I don't think so, and not even in isolation on that sentence, and let me give you two answers, one based on that sentence and one based on something that comes after. So the first is that the sentence begins, clearly more data from carefully designed studies are necessary before any definitive conclusions can be reached, and before, this is where we get to the part that Your Honor just read from, RCB antagonists, humanized NICGRP monoclonal antibodies, or both, can be evaluated as therapeutic agents in humans. So it's advocating for more study before there's even evaluation in humans. But then the second point is something I this is the next page, at the very end of the septic shock discussion, you see expressly blocking CGRP receptors with specific antagonists or monoclonal antibodies. I think that makes very clear that monoclonal antibodies, as Wimowansa is using it, is in the receptor context, consistent with the overall focus of the reference. And I understand the point about the FactFinder's authority to resolve ambiguities, but I think once you look at this reference as a whole, and it's focused throughout on receptor therapy, that there's not any ambiguity left for the FactFinder to resolve. But if you have a peptide playing a role in disease, would it seem clear that there were two possible ways to deal with it, to deal with how it reacts on a receptor? Aren't there just two clear ways to do it? And when you've got established the role of CGRP, and particularly when you've got TAN too, then what you're claiming is not far off. So a couple of responses to that, Judge Lori. First, there are at least three ways, because there's also the tryptans which suppress the release of the peptide to begin with. And second, what would you antagonize the ligand with? There are other possibilities in the art. But third, and most fundamentally, CGRP does more than just activate this one receptor that is the focus of the migraine science. And that is why Wimowansa says, for a migraine treatment, the antagonist must be extremely specific to the CGRP receptors located in cerebral arteries to avoid potential deleterious side effects caused by blocking other vascular and non-vascular CGRP receptors. In other words, this is a peptide that does a number of things in the body. If the focus is on shutting off its ability to activate one receptor, then targeting the ligand itself potentially has significant downstream implications, and that has consequences for safety. And especially given that this is the body's natural rescue mechanism for ischemic shock. I was going to finish the sentence, if I may. You can finish your thought and use a little more if you want to. Thank you. I appreciate that, Your Honor. This is the body's natural rescue mechanism, and this has a much longer half-life, certainly than the small molecule antagonists, but also even than the aptamers, which are another comparator that the board referred to. Aptamers have a half-life of hours to days, Appendix 10309, whereas the full-length antibody has a much, much longer half-life, and that has significant consequences for safety that a skilled artisan would take into account in deciding what path to explore. Lumping together the entire, quote-unquote, CGRP pathway is an didn't identify substantial evidence to justify the obvious miscombination. I've not said anything about objective indicia, but unless the court has questions about our submission on that, I'm prepared to rest on our briefs on that subject. We will save the remainder of your time, Mr. J. Mr. Raich? Thank you, Your Honor. The board's judgment should be affirmed. The board found as a fact that a person of ordinary skill would have been motivated to apply the technique of antibody humanization developed in the 1980s to anti-CGRP antibodies, which were known in the literature and even commercially available by 2005. The board's finding was supported by substantial evidence. Reflecting the routine nature of this combination, TEVA does not dispute reasonable expectation of success or disclosure of all elements in the prior art. And I'd like to turn specifically to Wimela Lanz and Tan. So TEVA's factual arguments fail to demonstrate a lack of substantial evidence support because they run squarely into the board's detailed analysis of each of these references. Counsel, before you get into that, can I ask a question about the hypothetical that I posed to your friend on the other side? Do you agree with him that on this record, there's no dispute that what we are talking about is the use of these antibodies in a human? No, Your Honor. And so TEVA's experts testified that antibody humanization would have been needed before the antibodies could be administered to patients. And so, for example, while the motivation ultimately is therapeutic, humanized antibodies would have needed to have been made, they would have been needed to have been tested in vitro, and they would have needed to be tested in animals before ultimately satisfying the treatment goal. The board addresses this at Appendix 17, Note 20. So turning then to Wimela Lanz, there's a heading in Wimela Lanz, Therapeutic Potentials of CGRP Antagonists. And under that heading, there's anti-CGRP monoclonal antibodies, the subject matter of TEVA's claims. Wimela Lanz also identifies CGRP as a potential causative factor in migraine and other diseases. The board's finding that Wimela Lanz's support and motivation to humanize anti-CGRP antibodies for diseases such as migraine was thus robustly supported. So there are three important fact findings that I have as arguments with an attempt, their attempts to limit Wimela Lanz. What do you say in response to Mr. Jay's reliance on the sentence at the end of the carryover paragraph at Appendix 6587 of Wimela Lanz? This is the sentence that says, these data warrant further studies in an animal model of sepsis to determine whether blocking CGRP receptors with specific antagonists, i.e., his argument being that that indicates that the earlier references to CGRP antagonists was limited to receptors. I mean, I just think there's substantial evidence from the board to indicate that that's not the case. And first of all, sepsis isn't the only... If you can explain why. Sure. So first of all, Lily's experts in revealing Wimela Lanz agreed with the interpretation of the board that Wimela Lanz encouraged antibodies generally and not just receptor-limited antibodies. And then I think another important point is that the board's findings were consistent with other contemporaneous prior art in the migraine field, which likewise cited Wimela Lanz for its teaching regarding antagonizing the CGRP ligand. And so at Appendix 6429, and this is in the 1749 records, Your Honor, there's a reference called Bader, and it states that the CGRP ligand has recently attracted attention as a novel target in acute migraine treatment. And to support that statement, it cites the Wimela Lanz record. And this is reflected in the board's opinion at page 81, note 65. So we have both expert support and contemporaneous art interpreting Wimela Lanz consistent the way that Lily interpreted it before the board. So Teva's argument that Wimela Lanz would have discouraged humanized anti-CGRP antibodies simply because more data remained to be generated just can't be squared with Wimela Lanz's statement that humanized monoclonal antibodies should be explored. So the board appropriately credited this express statement of encouragement and again heard supporting testimony from Lily's clinical expert. I'd like to turn now to the TAN reference. So Teva's factual challenges to the TAN reference similarly lack merit. Teva argued in its opening brief that TAN failed to show immunoblockade with anti-CGRP antibodies in a particular assay based on just a subset of TAN's experimental results. But Teva failed to dispute three factual findings providing substantial evidence for the board's motivation findings. First, the board found that TAN disclosed achieving a 16% response with a longer two-hour incubation time and a higher dose. The board found that this was a positive trend in results, that's a quote, showing that TAN's anti-CGRP antibody has activity in vivo. The board heard testimony on this point from all three of Lily's experts, a clinician, an antibody engineer, and an antibody pharmacologist. Second, the board credited TAN's disclosure of specific recommendations to use higher doses and longer incubation times to further improve antibody activity. Again, the board heard testimony about TAN's recommendations from all of Lily's experts. As the board concluded, TAN expressed optimism that higher concentrations or longer incubation times would achieve the desired results for anti-CGRP activity, that's at A57. And third, the board found a lack of deterrence in the prior art after TAN as researchers continued to propose anti-CGRP antibodies for treating diseases such as migraine, psoriasis, neurogenic inflammatory pain, and eye pain. This is objective evidence that TAN did not have the effect, as Teva argues, of discouraging or teaching away in the prior art. And I guess the Tava does not dispute that it itself used higher doses and longer incubation times, just as TAN recommended. Teva even cited TAN in the specific example where it used higher doses and longer incubation times. Doing exactly what the prior art says to do is not inventive. It is obvious. What response do you have to the argument that the opposing council makes that TAN was 10 years prior to the invention in this case, suggesting that if TAN had really been as revelatory as your argument is, that certainly it wouldn't have taken 10 years for someone to come up with the idea? I think, Your Honor, there are sort of two fundamental response to that. The first is more factual in nature, is that people continue to explore CGRP in the past. In particular, there were studies that showed that the safety concerns that Teva emphasized were potential concerns and not actual concerns. So I think, in terms of balancing safety and efficacy, there was just a finding that the safety concerns were not, perhaps, at all significant. I think the second thing I think that's important is just, you know, legally, there is case law that says, for example, that it's not so much time that's not necessarily dispositive. I think this comes up in Graham v. John Deere. And I think that, you know, to my point, in terms of an important finding with the Olson study, and that actually involved a clinical success by blocking the CGRP pathway. And so I think, with all of those things, all signs of 2005. That was a receptor case, right? That was a BIBN in Olson? Yeah, that's right. That's right, Your Honor. The Olson study itself involved antagonizing the receptor. But I think there were quite a few statements in the prior art that antagonizing the receptor and antagonizing the ligand were viewed as alternatives. So what about commercial success? There are a couple of products on the market that are dominated by this claim. Isn't that correct? That's right, Your Honor. And so I think there's a couple of responses to that. First of all, the claims are incredibly broad. These are exceedingly broad claims. And so there is a nexus problem between these commercial antibodies that have very specific properties, very specific amino acid sequences, that confer particular results. And the Board agrees that these were material properties. And I will point out that Teva has separately claimed and separately patented antibodies limited by sequence. So these are not the claims that we're talking about here. What if this were a generic compound claim with a nucleus and recitation of substituents and fraud, but the marketed products come within the scope of that claim? Would you say that a broad generic compound claim, structurally claimed, and that's important, structurally claimed, the compounds being within the scope of the claim, would you say that the breadth would disqualify commercial success from being effective? I think that that is a reasonable interpretation of the case law in terms of the presumption of nexus. I think that one could make a showing in terms of a novel in the claim and the specific property that was leading to the commercial success. That's simply just not the case here. And just to echo the point, Teva's claims are entirely functional. These are not structural claims. So I just want to draw a divide between our facts and even the facts of your hypothetical. I think the other point on commercial success is that even beyond nexus considerations, the board here found that Teva's secondary considerations evidence was weak on the merits and entitled to little or no weight for independent reasons. Counsel, do you agree, though, that the board seemed to overstate the holding of Fox Factory? I don't. I don't think that the board overstated the holding of Fox Factory. I think determining that there were really material characteristics, critically material characteristics that were elements of the commercial antibodies that are not reflected in the claims, and that that should appropriately eliminate any presumption. And I think it is important. Fox Factory didn't involve chemical or biological materials, which is where you've got the question of a generic claim. As you and I just discussed, Fox Factory dealt with a mechanical gadget where another aspect of the commercial product was not covered by the claim. I agree, Your Honor, that I mean, that is that is that is factually correct. But I think in terms of thinking about the material elements that that are representative of these antibodies, in addition to sequence that I mentioned, there was also there are also antibody fragments, which Teva's own expert testified would be useless as therapeutics. There's antibody class, which where the claims encompass antibodies from several classes that had never been used in any FDA approved therapeutics. And there's an antibody affinity where even the narrowest claims encompass antibodies with 5000 times weaker binding affinity than Joby and then a Joby, which is Teva's commercial antibody. In other words, if you point out these are functional claims. Yeah, these are these are absolutely functional claims. I mean, these these these claims are directed to the idea of of any antibody that would antagonize CGRP. These are functional claims. Are there any other further questions, Your Honor? Otherwise, we respectfully request. I have one question about the licensing issue. You know, I I understand that where you've got very broad licenses and and you don't have anything that would would sort of steer you to the licensing agreement, having been entered into because of the particular patents at issue, then then obviously we can't say that the licenses have that much meaning. But here it the particular patents at issue were the ones that prompted the licensing discussions and the first place. Isn't that right? Well, I think in this instance, it was actually a European patent because there was a European opposition proceeding. Right, but it related to the exact same invention, correct? I think it was a related patent application. But I think here again, the appropriate test was whether there was a nexus between the patent and the itself. Here, none of the six patents at issue. There was no showing made that those patents had a nexus with a specific licensing activity. And moreover, the evidence here showed and the board found that even if all six of the challenge patents were invalidated, all of the licensees payment obligations would continue unabated on the other 182 patents that were involved. You know, what you've got is that there's litigation relating to particular patents. And then you say, let's settle that. Let's enter into a licensing agreement. And the normal common practice is to say, well, we want something that covers the whole landscape. So we cover the landscape regardless of whether the other patents are any good or meaningful. And so what my problem is, is that the board seemed to simply say, just because there's a ultimate settlement, and the ultimate license, that therefore, you can't have a nexus to the very patents that prompted the discussions in the first place. Well, again, I think, first of all, I mean, the board had several lines of reasoning to its analysis. And one of which ultimately is just, even if you say that the evidence was still weak, as compared to the evidence of obviousness that we've been discussing, and that the board found with respect to the prior art. So that's the first thing. And second of all, I mean, TEVA made no effort, no showing that the license was the result specifically of these challenge claims, which are these incredibly broad claims. And so while there may be some kind of formal relationship between the patent that was the subject of the European opposition, they didn't actually make a showing that these claims, the challenge claims, were important to the licensing activity. Ultimately, the license included a number of different patent families, not just this particular patent family. And so some sort of showing should have been made, and it was not, Your Honor. Thank you, Mr. Raich. We will hear from you in a few moments. In the meantime, Mr. Jay has some rebuttal time. Thank you, Your Honor. Just a few quick points. On Wim LaWance I, the sentence at the end of the reference that we've discussed a couple of times, I just want to point out that in that sentence, if you read to the end of the sentence, you'll see that the role of these antibodies should be explored. And then the reference says, with respect to, and refers back to the several medical conditions that it has discussed above, including, it says, such as septic shock syndrome. And as the colloquy with Judge Bryson brought out, that's specifically referring to receptor antagonists. It couldn't be plainer. On TAN, the positive trend in results, a finding that my friend referred to, Louie's expert admits at 21018 of the appendix, that that's not a significant finding. It's based on data in two rafts, and that he would have, he admitted that he would have to repeat that in order for, repeat that study in order to draw any conclusions from it. The board... I'm sorry, Mr. Jay, what was that appendix reference? I missed it. I'm sorry, Your Honor. It's 21018. Okay, good. And the board kind of brushes past this at pages 43 to 44. So it refers to it, but doesn't explain why that admission isn't damaging. Just to respond to another thing my friend said, we do dispute the point, and we did dispute in our reply brief, the notion that TEVA relied on TAN's path. The citation to example three shows only that TEVA used the same control, a TAN experiment. It's called CGRP 837, as in the TAN experiment. That's not at all the same thing as following the TAN path. On VATER, I just want to point out quickly that the board at note 54 said the same thing that it said about the IBM, that it was not considering whether the success with aptamers would motivate someone to believe that an anti-CGRP ligand antagonist would be effective, just motivated to study antagonism. Turning to the secondary considerations, the test has always been, you know, reasonably commensurate. As Fox Factory said, it's a spectrum. It's not perfect correspondence. And here, the points that my friend tried to bring up saying that aspects that are unclaimed are responsible for the commercial success. That's just not correct. I just want to make two quick points about that. One is that the commercial products have different sequences from each other, so it's difficult to claim that the sequence is what's driving the success. The second about affinity is to just note that in the definition of anti-CGRP antagonist antibody at column 14, starting at line 19, binding affinity is actually built into the definition in the claim term. Thank you. We appreciate the arguments of both counsel. The case is submitted.